[Cite as *Fields-Arnold v. Cent. State Univ. Bd. of Trustees*, 2026-Ohio-826.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Lena Fields-Arnold, | : | No. 25AP-485 |
| Plaintiff-Appellant, | : | (Ct. of Cl. No. 2023-00279JD) |
| v. | : | (ACCELERATED CALENDAR) |
| Central State University Board of Trustees, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on March 12, 2026

**On brief:** *Duwel Law*, and *David M. Duwel*, for appellant.

**On brief:** *Dave Yost*, Attorney General, *Timothy M. Miller*, and *Michelle C. Brizes*, for appellee. **Argued:** *Timothy M. Miller*.

APPEAL from the Court of Claims of Ohio

EDELSTEIN, J.

{¶ 1} Plaintiff-appellant, Lena Fields-Arnold, appeals from the judgment of the Court of Claims of Ohio granting defendant-appellee, Central State University Board of Trustees ("CSU"), summary judgment on Ms. Fields-Arnold's claims of discrimination and retaliation in violation of the Family Medical Leave Act ("FMLA"). For the foregoing reasons, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} Ms. Fields-Arnold began working for CSU in May 2018. At the time, she worked with the school's radio station. (Fields-Arnold Dep. at 14.) In 2019, she began work as the Communication Coordinator for Land Grant, a position she remained in until she

was promoted to Executive Director of Public Relations and Communication for the university ("Executive Director"). (Dep. at 14-15.) It is Ms. Fields-Arnold's promotion, her time spent in that role, and her ultimate demotion back to her previous job with the university that gave rise to this litigation.

{¶ 3} Before she applied for the Executive Director position, Ms. Fields-Arnold encountered CSU president Dr. Jack Thomas at an event, who, despite not having met her before, encouraged her to apply. (Dep. at 42-45.) She ultimately applied and underwent a thorough interview process, including meeting with a search panel. (Dep. at 32.) She was one of two finalists for the job; the other finalist, like her, was an African American woman. (Dep. at 47.) Ms. Fields-Arnold was ultimately selected for the position, and Dr. Thomas called to offer the job and inform her of the salary and other details about the position. (Dep. at 41, 42.) Ms. Fields-Arnold accepted the position during that call. (Dep. at 51-52.)

{¶ 4} On June 6, 2022, Ms. Fields-Arnold met with Dr. Thomas in his office to further discuss his expectations for the position. (Dep. at 50.) Believing salary was still negotiable, Ms. Fields-Arnold asked why the salary discussed during their telephone call was lower than the salary Dr. Thomas originally mentioned during their earlier brief conversation about the job. (Dep. at 52.) After Ms. Fields-Arnold raised her salary concerns, the tone of the conversation shifted, and her relationship with Dr. Thomas became contentious. (Dep. at 51-53.) Dr. Thomas made certain comments during that conversation, including questioning her husband's salary (Dep. at 62-63), advising Ms. Fields-Arnold that she was not his choice for the job (Dep. at 49-50), and commenting that she talked "too much" like his wife (Dep. at 67). Before concluding the meeting, Dr. Thomas relented and increased Ms. Fields-Arnold's salary by $5,000. (Dep. at 53.) He also told her she would report to his Chief of Staff, Charles Shahid. (Dep. at 53.)

{¶ 5} A few weeks after Ms. Fields-Arnold began her work as Executive Director, she had another meeting with Dr. Thomas. During the meeting, Dr. Thomas blamed Ms. Fields-Arnold for deficiencies in social media coverage around a particular event. (Dep. at 78.) Ms. Fields-Arnold attempted to defend her work, but Dr. Thomas interrupted once again to tell her she talked too much. (Dep. at 70, 78.) Ms. Fields-Arnold believed her relationship with Dr. Thomas was hostile, and "[e]ven though [his] remarks weren't

necessarily made about [her] being a female, there were derogatory remarks directed at [her] job." (*See, e.g.*, Dep. at 78.)

{¶ 6} Ms. Fields-Arnold's duties as Executive Director were similar to the duties she performed in her prior role, but on a larger scale. (Dep. at 33-34.) While Ms. Fields-Arnold believed she was doing everything the job required of her, she was not certain Dr. Thomas's expectations for the role were consistent with the duties set forth in the job description. (Dep. at 77, 83.) Dr. Thomas, on the other hand, believed Ms. Fields-Arnold's work was deficient. In his affidavit appended to CSU's motion for summary judgment, Dr. Thomas described some of the deficiencies he observed: her written work had to be rewritten or heavily edited; she was not particularly helpful briefing Dr. Thomas about community events; he was not impressed with her advice for dealing with the media; and she lacked the necessary initiative to be successful in the position. (*See* Def.'s Mot. for Summ. Jgmt., Ex. 1, Thomas Aff. at 2.)

{¶ 7} On August 2, 2022, while still an at-will employee (Dep. at 125), Ms. Fields-Arnold was given a letter of demotion during a meeting with CSU's Human Resources Director, Pamela Bowman, and Mr. Shahid. The letter indicated that "President Thomas ha[d] discussed with [her] the nature of the job and issues concerning [her] job performance in this role" and concluded she was "unable to successfully fulfill the job duties and responsibilities necessary to effectively perform as the Executive Director, Communications and Public Relations." (Dep. Ex. G, Aug. 2, 2022 Letter.) Ms. Fields-Arnold was informed that Dr. Thomas made the decision to return her to her previous position (Dep. at 80-81), but she was not provided specific examples of the performance deficiencies giving rise to the demotion (Dep. at 80, 86, 123).

{¶ 8} Before her demotion, while she was still serving as Executive Director, Ms. Fields-Arnold submitted various leave requests. Ms. Fields-Arnold filed a request for FMLA sick leave sometime in June 2022. Email correspondence between Ms. Fields-Arnold and Ms. Bowman indicates there were some complications with the submitted FMLA paperwork. In one email, Ms. Bowman indicated the FMLA documentation required additional information from Ms. Fields-Arnold's physician. (*See* Dep. Ex. F, July 27, 2022 Email from Pamela Bowman; Dep. at 117-19.) After further correspondence, Ms. Fields-Arnold provided the requested documentation on August 2, 2022, the same date

she received her demotion letter.  Ultimately, that FMLA leave request was approved.  (Dep. at 115, 120.)

{¶ 9}    After her demotion, but while she was still employed by CSU, Ms. Fields-Arnold submitted additional FMLA leave requests, all of which were approved.  (Dep. at 115.)

{¶ 10} After her demotion, the Executive Director position was filled by a white woman named Debbie Alberico (Dep. at 68-69), and Ms. Fields-Arnold continued working with CSU in her former role until June 2024 (Dep. at 11).

{¶ 11}  On April 11, 2023, Ms. Fields-Arnold initiated this action against CSU raising claims of race, sex, and age discrimination under R.C. 4112.01, and retaliation in violation of the FMLA.  CSU moved for summary judgment as to all counts on February 14, 2025. The court of claims issued a decision and entry on May 14, 2025, granting summary judgment in CSU's favor on all counts and dismissing the case.

{¶ 12}  Ms. Fields-Arnold timely appealed from that judgment and now raises the following three assignments of error for our review:

> [I.] THE TRIAL COURT ERRED IN ITS SUMMARY JUDGMENT DECISION WHEN IT DETERMINED THAT APPELLANT'S AUGUST 2, 2022 DEMOTION WAS NOT PREDICATED ON SEX AND/OR RACIAL DISCRIMINATION.
>
> [II.] THE TRIAL COURT ERRED IN ITS SUMMARY JUDGMENT DECISION WHEN IT DETERMINED THAT APPELLANT COULD NOT ESTABLISH A CLAIM OF A HOSTILE WORKING ENVIRONMENT BASED ON SEX.
>
> [III.] THE TRIAL COURT ERRED IN ITS SUMMARY JUDGMENT DECISION WHEN IT DETERMINED THAT THERE WASN'T A CAUSAL CONNECTION BETWEEN APPELLANT'S REQUEST FOR FMLA AND THE AUGUST 2, 2022 DEMOTION.

## II. ANALYSIS

### A. Summary Judgment Standard and Standard of Review

{¶ 13}  Under Civ.R. 56(C), summary judgment is proper when the moving party establishes: (1) an absence of a genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) construing the evidence most strongly in

favor of the nonmoving party, reasonable minds could only find in favor of the moving party. *See, e.g.*, *Buck-Reed v. Sanford Plumbing, LLC*, 2025-Ohio-5195, ¶ 18 (10th Dist.), citing *State ex rel. Duncan v. Mentor City Council*, 2005-Ohio-2163, ¶ 9, and *Oliver v. Fox's Food, LLC*, 2023-Ohio-1551, ¶ 9 (10th Dist.). The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying the portions of the record that demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the nonmoving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the nonmoving party has no evidence to support the nonmoving party's claims. *See, e.g.*, *Dresher* at 293; *Buck-Reed* at ¶ 20.

{¶ 14} If the moving party satisfies its initial burden under Civ.R. 56(C), then the nonmoving party " 'has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.' " *Heimberger v. Zeal Hotel Group Ltd.*, 2015-Ohio-3845, ¶ 14 (10th Dist.), quoting *Dresher* at 293. The nonmoving party may not rest on the mere allegations and denials in the pleadings, but instead must point to or submit some evidentiary material that shows the existence of a genuine dispute over a material fact. *A.M. v. Miami Univ.*, 2017-Ohio-8586, ¶ 30 (10th Dist.), citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist. 1991). In the summary judgment context, a "material" fact is one that could affect the outcome of the case under the applicable substantive law. *Plough v. Nationwide Children's Hosp.*, 2024-Ohio-5620, ¶ 30, citing *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993). A genuine dispute exists if the evidence presents a sufficient disagreement between the parties' positions. *Id.*

{¶ 15} We review decisions granting summary judgment de novo. *Gabriel v. Ohio State Univ. Med. Ctr.*, 2015-Ohio-2661, ¶ 12 (10th Dist.), citing *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 2014-Ohio-3935, ¶ 5 (10th Dist.). "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." (Internal quotations omitted.) *Holt v. State*, 2010-Ohio-6529, ¶ 9 (10th

Dist.). " 'We must affirm the trial court's judgment if any grounds the movant raised in the trial court support it.' " *Buck-Reed* at ¶ 22, quoting *Riverside v. State*, 2010-Ohio-5868, ¶ 17 (10th Dist.).

{¶ 16} It is well-established, however, that "on a summary-judgment motion, any inferences regarding the evidence, including the resolution of ambiguities or inconsistencies, must be made in a manner that favors the nonmoving party." *Smathers v. Glass*, 2022-Ohio-4595, ¶ 32. Thus, " '[w]here competing inferences may be drawn or where the facts presented are uncertain or indefinite, summary judgment is not appropriate and such matters must be left to the trier-of-fact.' " *Buck-Reed* at ¶ 23, quoting *Thompson v. Ohio State Univ. Physicians, Inc.*, 2011-Ohio-2270, ¶ 16 (10th Dist.).

### B. First Assignment of Error: Sex and Race Discrimination

{¶ 17} In her first assignment of error, Ms. Fields-Arnold argues the trial court erred in granting summary judgment as to her "sex and/or racial discrimination" claim.

{¶ 18} R.C. 4112.02(A) provides that it is an unlawful discriminatory practice "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent through either direct or indirect methods of proof. *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist. 1998), citing *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996). Direct evidence of discriminatory intent consists of evidence "that can be interpreted as an acknowledgment of discriminatory intent," and only the most blatant remarks will constitute direct evidence of discrimination. *Dautartas v. Abbott Laboratories*, 2012-Ohio-1709, ¶ 35 (10th Dist.), quoting *Southworth v. N. Trust Sec., Inc.*, 2011-Ohio-3467, ¶ 4 (8th Dist.).

{¶ 19} If a plaintiff lacks direct evidence of discriminatory intent, they may raise an inference of discriminatory intent indirectly through the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Mauzy* at 583. Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.* at 802; *Plumbers & Steamfitters Joint*

*Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 197 (1981). To establish a prima facie case of discrimination, a plaintiff must demonstrate that they (1) are a member of a protected class, (2) suffered an adverse employment action, (3) were qualified for the position in question, and (4) were replaced by someone outside of the protected class or that the employer treated a similarly situated non-protected person more favorably. *McDonnell Douglas Corp.* at 802; *Veal v. Upreach LLC*, 2011-Ohio-5406, ¶ 21 (10th Dist.). Establishing a prima facie case "creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

{¶ 20} If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the challenged action. *Williams v. Akron*, 2005-Ohio-6268, ¶ 12; *Bowditch v. Mettler Toledo Internatl., Inc.*, 2013-Ohio-4206, ¶ 16 (10th Dist.). The employer's burden at this stage "is one of production (not persuasion)." *Boyd v. Ohio Dept. of Mental Health*, 2011-Ohio-3596, ¶ 27 (10th Dist.), citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the employer submits evidence that "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," the employer has met its burden of production. (Emphasis in original.) *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

{¶ 21} If the employer meets its burden, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine* at 253, citing *McDonnell Douglas Corp.* at 804. A plaintiff may establish that the reasons offered by the employer were a pretext for discrimination by demonstrating that the articulated reasons had no basis in fact, were not the actual reasons for the adverse action, or were insufficient to explain the employer's action. *Hartman v. Ohio Dept. of Transp.*, 2016-Ohio-5208, ¶ 21 (10th Dist.), quoting *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-4210, ¶ 77 (10th Dist.). Although the burdens of production shift under the *McDonnell Douglas* analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine* at 253.

### 1. Race Discrimination

{¶ 22} As to Ms. Fields-Arnold's race discrimination claim, the court of claims concluded that even if she could establish a prima facie case because a white woman replaced her in the Executive Director role, Ms. Fields-Arnold "failed to refute [CSU]'s legitimate explanation for its employment decisions." (May 14, 2025 Decision at 10.) The court noted, "While Plaintiff disagrees that her performance was lacking, statements that are nothing more than rumors, conclusory allegations, or subjective opinions are insufficient evidence on which the Corut can conclude that [CSU]'s legitimate explanation is pretext for discrimination." (Decision at 10, citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992).)

{¶ 23} The argument in Ms. Fields-Arnold's brief regarding race discrimination is limited to the appearance of the word "race" in the assignment of error, in one sentence describing CSU's arguments, and in the concluding sentence of that section of her brief. This limited mention of "race" fails to satisfy App.R. 16(A)(7), which mandates that an appellant's brief include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Ms. Fields-Arnold's assignment of error is substantively deficient as to her race discrimination claim because she fails to provide any cognizable argument or legal authority in support of any argument.

{¶ 24} Based on Ms. Fields-Arnold's failure to comply with App.R. 16(A) as to her race discrimination claim, we disregard and summarily overrule that portion of her assignment of error. *See* App.R. 12(A)(2). *See also Angus v. Angus*, 2015-Ohio-2538, ¶ 10 (10th Dist.), citing *CitiMortgage, Inc. v. Asamoah*, 2012-Ohio-4422, ¶ 5 (10th Dist.).

### 2. Sex Discrimination

{¶ 25} As to Ms. Fields-Arnold's second assignment of error, the court of claims concluded that Ms. Fields-Arnold failed to present direct evidence of sex discrimination and proceeded to consider her claim under the *McDonnell Douglas* framework. The court then concluded Ms. Fields-Arnold "failed to submit any evidence that a non-protected employee 'dealt with the same supervisor, ha[s] been subjected to the same standards[,] and [has] engaged in the same conduct without such differentiating or mitigating

circumstances that would distinguish their conduct or the employer's treatment of them for it.' " (Decision at 9, quoting *Brehm v. Macintosh Co.*, 2019-Ohio-5322, ¶ 39 (10th Dist.), and *Osborn v. Ohio Reformatory for Women*, 2021-Ohio-1036, ¶ 23 (10th Dist.).) The court noted that Ms. Fields-Arnold "admit[ted] the employee that CSU subsequently appointed to be the Executive Director of PR was both female and not substantially younger than [her]." (Decision at 9, citing *Drummond v. Ohio Dept. of Rehab. & Corr.*, 2022-Ohio-1096, fn. 5 (10th Dist.).)

{¶ 26} On appeal, Ms. Fields-Arnold asserts the trial court erred in concluding she presented no direct evidence of sexual discrimination. She points to comments made by Dr. Thomas over the course of her less than two months of employment as Executive Director, including twice indicating that she talked too much like his wife and asking about her husband's employment and salary.

{¶ 27} CSU claims in response that Ms. Fields-Arnold waived the ability to present a case of direct evidence of discrimination. CSU points to its summary judgment argument regarding Ms. Fields-Arnold's discrimination claims, which identified the case as one under the indirect proof method and went on to challenge her claims under the *McDonnell Douglas* burden-shifting framework. (*See* Appellee's Brief at 16, quoting Mot. for Summ. Jgmt. at 7.) And, according to CSU, Ms. Fields-Arnold failed to contest this characterization of her claims in her memorandum in opposition to summary judgment.

{¶ 28} Upon review of the summary judgment filings, we agree. While she identified comments made by Dr. Thomas, stated that "Thomas stepped into the stereotype of a man telling a woman that she talked too much" (Pl.'s Resp. to Def.'s Mot. for Summ. Jgmt. at 2), and claimed "[t]he comments made by [Dr.] Thomas during the meeting create an inference of sexual discrimination," Ms. Fields-Arnold did not affirmatively challenge this characterization of her arguments or make any legal arguments under the direct proof method. (*Id.* at 3.) As a result, it is understandable that the trial court concluded she had not presented direct evidence of sex discrimination and proceeded to consider her claim under the *McDonnell Douglas* framework. And Ms. Fields-Arnold cannot now correct that failure.

{¶ 29} Even if Ms. Fields-Arnold had not waived an argument under the direct proof method, we find she did not present actual direct evidence of sex discrimination. Dr.

Thomas's comments, while disrespectful and perhaps based on stereotypes, do not satisfy the requirements to constitute direct evidence of discrimination. " 'Direct evidence is proof which speaks directly to the issue, requiring no support by other evidence.' " (Further quotations omitted.) *Friedman v. Ebner Properties*, 2023-Ohio-4398, ¶ 19 (10th Dist.), quoting *Chapa v. Genpak, L.L.C.*, 2014-Ohio-897, ¶ 89 (10th Dist.). It " 'does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.' " *Ray v. Ohio Dept. of Health*, 2018-Ohio-2163, ¶ 27 (10th Dist.), quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). *See also Ceglia v. Youngstown State Univ.*, 2015-Ohio-2125, ¶ 16-23 (10th Dist.).

{¶ 30} Upon review of the record, we are unable to conclude Ms. Fields-Arnold presented direct evidence of sex discrimination. In fact, even Ms. Fields-Arnold stated in her deposition testimony that the "remarks weren't necessarily made about my being a female, [but] they were derogatory remarks directed at my job." (Dep. at 78.) As a result, we agree with CSU that, even if Ms. Fields-Arnold did not waive her ability to argue under the direct proof method, she failed to present direct evidence of discrimination.

{¶ 31} On appeal, Ms. Fields-Arnold does not appear to challenge the trial court's decision that she did not identify a non-protected, similarly-situated employee who was treated differently and therefore failed to establish a prima facie case of either sex or age discrimination under the *McDonnell Douglas* framework. (*See* Brief of Appellant at 9-11; Reply Brief of Appellant at 3-4.) As such, we need not consider the trial's court's determinations under the indirect method of proof.

{¶ 32} For these reasons, we overrule Ms. Fields-Arnold's first assignment of error.

### B.  Second Assignment of Error: Hostile Environment on Basis of Sex

{¶ 33} To succeed on an action for a hostile work environment on the basis of sex, the plaintiff must demonstrate "(1) the employee is a member of a protected class, (2) the harassment was unwelcome, (3) the harassment was based on [sex], (4) the harassment had the effect or purpose of unreasonably interfering with the employee's work performance or of creating an intimidating, hostile, or offensive work environment, and (5) employer liability through respondeat superior." *Hinton v. Ohio Dept. of Youth Servs.*, 2022-Ohio-4783, ¶ 33 (10th Dist.), citing *Chapa*, 2014-Ohio-897, at ¶ 33 (10th Dist.).

"When considering whether the harassment is severe or pervasive, we employ both an objective and a subjective test." *Croley v. JDM Servs., LLC*, 2025-Ohio-4762, ¶ 37 (10th Dist.), citing *EEOC v. Village at Hamilton Point L.L.C.*, 102 F.4th 387, 401 (7th Cir. 2024). *See also Hinkle v. L Brands, Inc.*, 2021-Ohio-4187, ¶ 16 (10th Dist.), quoting *Camp v. Star Leasing Co.*, 2012-Ohio-3650, ¶ 29 (10th Dist.), quoting *Faragher v. Boca Raton*, 524 U.S. 775, 787 (1998). In addition to considering the subjective belief of the employee, herself, we are also "tasked with resolving whether a reasonable person would find the conduct sufficiently severe to alter the conditions of their employment." *Croley* at ¶ 37. We consider the totality of the circumstances when determining whether a workplace environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." (Internal citations omitted.) *Hinkle* at ¶ 16.

{¶ 34} With respect to her hostile work environment claim, the court of claims wrote:

> It is not disputed that Dr. Thomas never made any derogatory comments about women or African Americans. Further, the Court is not persuaded by Plaintiff's suggestion that Dr. Thomas asking one time about Plaintiff's husband's salary and mentioning one time that he tells his wife she talks too much created a hostile work environment based on sex. Even if Dr. Thomas's comments arguably amount to sexual innuendo or crass language, comments that are trivial or only annoying [are] not sufficient to establish sexual harassment. . . . To the contrary, Plaintiff specifically denied that Dr. Thomas's comments prevented her from performing her work duties. Moreover, Plaintiff submitted no evidence or legal support to demonstrate there is a genuine issue of material fact whether Dr. Thomas saying Plaintiff talked too much on two occasions was sufficiently hostile or otherwise based on her race or her sex.
>
> In short, the Court finds that Plaintiff has failed to meet her reciprocal burden outlined in Civ.R. 56(E).

(Decision at 11.)

{¶ 35} On appeal, Ms. Fields-Arnold attempts to challenge the trial court's determination that Dr. Thomas "never made any derogatory statements about women" and

asserts the two instances when comments *were* made "had a chilling effect upon Ms. Fields and would eventually result in a $29,000 demotion." (Brief of Appellant at 12.)

{¶ 36} But, as CSU asserts, like her argument under her first assignment of error, Ms. Fields-Arnold waived her ability to challenge the trial court's determination as to her hostile environment claim. CSU is correct that Ms. Fields-Arnold's memorandum contra summary judgment neither mentioned the term "hostile work environment" nor cited any legal authority concerning such a claim. (Brief of Appellee at 22.) Additionally, Ms. Fields-Arnold did not respond to CSU's summary judgment arguments that Dr. Thomas's "two isolated comments over a two-month period are neither sufficiently severe nor pervasive to constitute a hostile work environment" and that she admitted during her deposition that "it did not prevent her from being able to do her job." (Mot. for Summ. Jgmt. at 7, quoting Fields-Arnold Dep. at 77.) As such, we agree Ms. Fields-Arnold waived her ability to raise error as to her hostile environment claim on appeal and overrule her second assignment of error.

## C. Third Assignment of Error: FMLA Retaliation Claim

{¶ 37} An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights under the FMLA. 29 U.S.C. 2615(a)(1). And an employer may not base an adverse employment action on an employee's exercise of rights under the FMLA. *Ressler v. Ohio Atty. Gen.*, 2015-Ohio-777, ¶ 14 (10th Dist.). "Pursuant to 29 U.S.C. 2617(a)(1), an employer who violates 29 U.S.C. 2615 is liable to any eligible employee affected, and 29 U.S.C. 2617(a)(2) provides individual employees a right to sue in state or federal court." *Randolph v. Grange Mut. Cas. Co.*, 2009-Ohio-6782, ¶ 7 (10th Dist.).

{¶ 38} Two theories of recovery arise under these statutes—interference and retaliation. *Edgar v. JAC Prods.*, 443 F.3d 501, 507 (6th Cir. 2006). Under the interference or entitlement theory, "the issue is simply whether the employer provided its employee the entitlements set forth in the FMLA." *Arban v. W. Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003), quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998). In contrast, under the retaliation theory, we consider whether an employer took an adverse employment action because the employee exercised her rights under the FMLA. *Donald v.*

*Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). Ms. Fields-Arnold's amended complaint asserted a claim of retaliation. (*See* Feb. 1, 2024 Am. Compl. at 6.)

{¶ 39} To establish a prima facie case of retaliation under the FMLA, a plaintiff must show: (1) she was engaged in an activity protected by the FMLA, which includes use of leave time; (2) the employer knew she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Hilbert v. Ohio Dept. of Transp.*, 2017-Ohio-488, ¶ 40 (10th Dist.), citing *Donald* at 761. *See also Mahoney-Offi v. Great Expressions Dental Ctrs.*, 2024-Ohio-5160, ¶ 12 (11th Dist.), quoting *Snyder v. U.S. Bank Natl. Assn.*, 2022 U.S. App. LEXIS 32984, *4 (6th Cir. Nov. 29, 2022).

{¶ 40} A plaintiff establishes a causal connection by producing evidence from which an inference can be drawn that the employer would not have taken the adverse action in the absence of the protected activity. *Hilbert* at ¶ 42; *Gibson v. Shelly Co.*, 314 Fed.Appx. 760, 772 (6th Cir. 2008). Close temporal proximity between the employee's protected activity and the adverse employment action may constitute evidence of a causal connection. *See Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, ¶ 41 (10th Dist.); *Dautartas*, 2012-Ohio-1709, at ¶ 54 (10th Dist.), quoting *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting "some cases have 'accept[ed] mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality,' but that they have only done so when the temporal proximity is 'very close' "); *Hartman*, 2016-Ohio-5208, at ¶ 31 (10th Dist.).

{¶ 41} If a plaintiff succeeds at establishing a prima facie case of retaliation, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Moody* at ¶ 36; *Childs v. Kroger Co.*, 2023-Ohio-2034, ¶ 99 (10th Dist.). If that burden is satisfied, the plaintiff must then show the articulated reason is pretext for unlawful retaliation. *Moody* at ¶ 36; *Childs* at ¶ 99, citing *Nebozuk v. Abercrombie & Fitch Co.*, 2014-Ohio-1600, ¶ 41 (10th Dist.), citing *Carney v. Cleveland Hts.-Univ. Hts. City School Dist.*, 143 Ohio App.3d 415, 429 (8th Dist. 2001).

{¶ 42} Ms. Fields-Arnold's retaliation argument amounts to the following: she sought FMLA leave before and it was granted; she sought it again, it was delayed, she

submitted updated paperwork, and then, within a few hours, she was demoted. (*See* Pl.'s Resp. to Def.'s Mot. for Summ. Jgmt. at 4-5.) Regardless of whether her request was ultimately approved, she asserts she was punished by a demotion because she requested FMLA leave.

{¶ 43} But the court of claims did not engage with this argument. Instead, the court concluded Ms. Fields-Arnold could not establish a causal connection between any alleged adverse employment action taken by CSU and her FMLA leave requests. The court premised its conclusion on two main findings: (1) the actions Dr. Thomas took did not dissuade Ms. Fields-Arnold from exercising her right under the FMLA and, therefore, she failed to identify an adverse employment action that was taken against her because she used FMLA leave; and (2) Ms. Fields-Arnold could not show a causal connection between Dr. Thomas's actions and her exercise of her FMLA rights, "given [CSU]'s previous and subsequent approval of Plaintiff's leave requests." (Decision at 13-14.)

{¶ 44} We disagree. Even if an employer approves an employee's FMLA requests, the employer could still go on to impose an adverse employment action against the employee for exercising her rights under the FMLA. *See, e.g.*, *Donald*, 667 F.3d at 761 (comparing FMLA interference and FMLA retaliation claims). And that is exactly what Ms. Fields-Arnold alleged in her complaint—that she was demoted because she took FMLA leave. We find the court of claims erred in concluding Ms. Fields-Arnold "failed to identify an adverse employment action that was taken against her because she used FMLA leave." (Decision at 13.)

{¶ 45} Although we find the trial court erred in its determination that Ms. Fields-Arnold did not suffer an adverse employment action, we need not address the causal connection element because, as CSU argues, even if we were to conclude the trial court erred as to that element, CSU is still entitled to summary judgment on Ms. Fields-Arnold's retaliation claim.

{¶ 46} Ms. Fields-Arnold argues a genuine dispute of material fact remains as to whether CSU's non-retaliatory reasons for her demotion were pretextual because she was not notified about performance issues during her employment as Executive Director and Dr. Thomas, Ms. Bowman, and Mr. Shahid failed to provide any explanation for her demotion before, during, or after she was notified about the decision. (*See, e.g.*, Brief of

Appellant at 10-11.)  Although Ms. Fields-Arnold did not receive specific examples of her unsatisfactory performance at or around the time of the demotion (*see* Dep. at 80, 86, 123), she *was* aware of Dr. Thomas's dissatisfaction before the demotion occurred.  In her deposition, Ms. Fields-Arnold recounted two meetings where Dr. Thomas criticized her performance.  (*See, e.g.*, Dep. at 70-71, 78-79.)

{¶ 47}  While Ms. Fields-Arnold's deposition testimony reflects her general belief that she satisfied the job duties as listed in the job description (Dep. at 80, 83), she did not contest the specific assertions Dr. Thomas made about her purportedly unsatisfactory work. In his affidavit appended to CSU's summary judgment motion, Dr. Thomas averred that he was "not satisfied with [Ms. Fields-Arnold's] written work product, and either one of [his] other direct[] reports or [he] had to rewrite or heavily edit Ms. Fields-Arnold's work product." (Def.'s Mot. for Summ. Jgmt., Ex. 1, Thomas Aff. at 2.)  Yet Ms. Fields-Arnold did not contradict that claim, either through deposition testimony or some other form of evidence.  Similarly, while Dr. Thomas asserted he was "not impressed" with Ms. Fields-Arnold's advice for dealing with the media and her "level of preparation did not meet [his] expectations," Ms. Fields-Arnold did not submit any Rule 56 evidence to contradict his statements.  (*Id*.)  Additionally, while Dr. Thomas expected Ms. Fields-Arnold to accompany him at important community events, his affidavit noted her absence at what he believed was an important Juneteenth event.  (*Id*.)  Ms. Fields-Arnold did not refute that statement.

{¶ 48}  After CSU provided legitimate, non-retaliatory reasons for her demotion, Ms. Fields-Arnold had the burden at summary judgment to present evidence establishing a genuine dispute about the truth of those reasons.  She failed to carry that burden.

{¶ 49}  Therefore, although we disagree with the trial court's analysis as to Ms. Fields-Arnold's FMLA retaliation claim, we conclude summary judgment was proper on other grounds and overrule Ms. Fields-Arnold's third assignment of error.

## III.  CONCLUSION

{¶ 50}  Having overruled Ms. Fields-Arnold's first, second, and third assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

DORRIAN and LELAND, JJ., concur.

LELAND, J., concurring.

{¶ 51} While I concur in the judgment of the majority decision to overrule all three assignments of error, I write separately because I would find no error in the trial court's conclusion that Ms. Fields-Arnold failed to state a prima facie claim for retaliation.

{¶ 52} "To establish a prima facie case of retaliation circumstantially, a plaintiff must show that: (1) she exercised rights afforded by FMLA, (2) she suffered an adverse employment action, and (3) there was a causal connection between her exercise of rights and the adverse employment action." *Ressler v. Atty. Gen.*, 2015-Ohio-777, ¶ 14 (10th Dist.). Although in certain circumstances an adverse employment action occurring soon after the exercise of FMLA rights could be sufficient to establish a prima facie case of retaliation, it is also true that "proximity alone does not necessarily imply causation." *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, ¶ 41 (10th Dist.). Even viewing the evidence in a light most favorable to Ms. Fields-Arnold, I would find she failed to show a causal connection between her use of FMLA leave and her demotion.

{¶ 53} The facts relevant to this issue are as follows. Ms. Fields-Arnold stated that on June 30, 2022, Dr. Thomas approved both her request for six days of vacation leave in July and August and her informal request for FMLA sick leave in mid-July. Then, in mid-July 2022, Ms. Fields-Arnold submitted her official FMLA leave request to CSU's human resources director. On August 2, 2022, CSU informed Ms. Fields-Arnold she would be demoted. On September 20, 2022, CSU approved Ms. Fields-Arnold's FMLA leave request. CSU also approved her subsequent requests for FMLA leave that she submitted after her demotion.

{¶ 54} CSU thus approved Ms. Fields-Arnold's FMLA leave requests before and after her demotion. Even though her demotion occurred soon after she requested FMLA leave, Dr. Thomas and CSU did not take issue with or deny any of her FMLA leave requests. The evidence presented to the trial court, even viewed in Ms. Fields-Arnold's favor, cuts against a theory of causation and therefore nullifies even a prima facie claim of retaliation. It would be an odd sort of retaliation to first approve Ms. Fields-Arnold's request for leave, then demote her for taking leave, and finally proceed to approve her multiple future requests for leave.

{¶ 55} Given this factual background, I would affirm the trial court's conclusion that Ms. Fields-Arnold failed to establish a prima facie case of retaliation.

---